UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVAYA INC., | Case No. 19-cv-00565-SI |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND GRANTING ADMINISTRATIVE MOTIONS TO SEAL** |
| RAYMOND BRADLEY PEARCE, *et al*., | |
| Defendants. | Re: Dkt. Nos. 70, 86, 128, 136 |

On November 8, 2019, the Court held a hearing on motions to dismiss for lack of personal jurisdiction filed by defendants Jason Hines, Dedicated Business Systems International, LLC, and US Voice & Data, LLC. For the reasons set forth below, the Court concludes that it has specific jurisdiction over defendants and DENIES the motions to dismiss. The Court GRANTS the administrative motions to seal.[1]

**BACKGROUND**

**I.     The Parties**

Plaintiff Avaya, Inc. ("Avaya") is a Delaware corporation with its principal place of business located in Santa Clara, California. First Amend. Compl. ¶ 6 ("FAC") (Dkt. No. 59). Avaya provides

---

[1] In April and May of 2019, Hines, DBSI, and US Voice filed motions to dismiss for lack of personal jurisdiction. In an order filed July 9, 2019, the Court deferred ruling on the motions to dismiss to allow Avaya to conduct jurisdictional discovery.

Plaintiff and defendants seek to file under seal portions of the supplemental briefing and exhibits. The material at issue was designated as confidential by defendants. Although defendants did not file a declaration in support of plaintiff's administrative motion to seal (as is required by Civil Local Rule 79-5(e)(1) and this Court's October 15, 2019 order, Dkt. No. 132), defendants did file a declaration in support of their administrative motion to seal. Because the material at issue is similar, the Court finds it appropriate to grant both motions. Defendants are reminded to adhere to Civil Local Rule 79-5 and this Court's standing order for all future administrative motions to seal.

1    hardware, software, and communication solutions to companies ranging from small businesses to

2    government organizations. *Id.* ¶ 21. According to the FAC, "Avaya sells its products and services

3    directly to customers and indirectly through approximately 4,700 contractually-authorized channel

4    partners, which account for about 71% of total product revenue." *Id.* ¶ 22. "For indirect sales

5    through partners, Avaya utilizes a two-tiered distribution structure wherein Avaya sells directly to

6    a relatively small number of authorized distributors that are required to sell only to contractually-

7    authorized resellers. Those resellers are contractually obligated to sell directly to end-user

8    customers." *Id.* Avaya does not sell its software, and instead "offers its software to be licensed

9    through authorized channels, not including third-party marketplaces." *Id.* ¶ 33. The software is

10   licensed to a specific end customer and is generally non-transferrable. *Id.* Plaintiff claims that

11   defendants have been selling unauthorized Avaya software licenses in competition with authorized

12   Avaya software and misusing Avaya's trademarks to do so. *Id.*

13   Defendants Jason Hines, Dedicated Business Systems International, LLC ("DBSI"), and Tri-

14   State Communications Services LLC d/b/a US Voice & Data are former authorized Avaya

15   distributors. *Id.* ¶ 18. Avaya alleges that because defendants are former Avaya partners, they knew

16   that Avaya's principal place of business is located in Santa Clara, California. *Id.* Mr. Hines is an

17   individual who resides in Caldwell, New Jersey. *Id.* ¶ 8. Mr. Hines is the sole member of defendants

18   DBSI and Tri-State Communications Services LLC d/b/a US Voice & Data.[2] Hines Decl. in Supp.

19   of Hines' and DBSI's Mtn. ¶ 15 ("Hines DBSI Decl.") (Dkt. No. 70-1); Hines US Voice Decl. ¶ 1.

20   DBSI and Tri-State/US Voice & Data are New Jersey companies with their principal places of

21   business in Fairfield, New Jersey. Hines DBSI Decl. ¶¶ 17-18; Hines US Voice Decl. ¶¶ 4, 6; FAC

22   ¶ 46 ("DBSI and Tri-State apparently share an office at 165 Passaic Avenue in Fairfield, New

23   Jersey").[3] Avaya alleges that Hines has conducted and continues to conduct business under the

24

25   _____

26   [2] Mr. Hines states in his declaration that Tri-State Communication Services, LLC changed its name to US Voice & Data, LLC, on or about December 7, 2018. Hines Decl. in Supp. of US Voice & Data's Mtn. ¶ 3 ("Hines US Voice Decl.") (Dkt. No. 86-1). This order refers to Tri-State and US Voice & Data interchangeably.

27

28   [3] The FAC includes a picture of multiple signs outside the same office, "Suite 107," and the signs include "AVAYA Returns," "DBSI" and "Tri-State Communication Services." *Id.* ¶ 46.

1    name of DBSI, and that Hines "is the primary individual conducting business through Defendant

2    Tri-State, including using the alias 'Chad Johnson.'" FAC ¶¶ 8-9. Avaya alleges that after their

3    partner agreements were terminated, Hines, DBSI, and Tri-State/US Voice & Data participated in a

4    scheme to distribute stolen Avaya software licenses. The FAC alleges that each defendant is, *inter*

5    *alia*, the agent and alter ego of the other defendants. *Id*. ¶ 15.

6

7    **II.    Underlying Factual Allegations**

8            One of the products that Avaya offers is IP Office ("IPO"), which is a telephone system

9    capable of supporting anywhere from five to thousands of users at up to 150 locations. *Id*. ¶ 23.

10   Currently, there are five "editions" of IPO, and all editions "require per-endpoint software licensing,

11   meaning each phone or computer on the system must be licensed in the IPO software. Additional

12   features, such as voicemail, require additional software licenses on a per-endpoint basis. Thus, each

13   individual phone on a customer's system may be licensed to several feature sets and enabled by

14   multiple software licenses. These IPO software licenses are sold by Avaya and its authorized

15   partners, and then distributed to the licensed end users through unique software license keys." *Id.*

16   Avaya has obtained copyright protection for the IPO software, and that protection covers the

17   licenses. *Id*. ¶¶ 29-30.

18           Avaya alleges that defendants "perpetrat[ed] a massive illegal software piracy operation,

19   which resulted in the theft and subsequent resale of thousands of unauthorized Avaya Internal Use

20   Software Licenses ('Internal Use Licenses') to end customers duped into buying pirated software,

21   rather than buying genuine Avaya software licenses through authorized Avaya distribution

22   channels." *Id.* ¶ 1. Avaya alleges that "[l]ong-term Avaya employee Defendant Pearce, in collusion

23   with former Avaya authorized reseller Defendant Hines, willfully resold and distributed, and

24   facilitated the further distribution and resale of, thousands of Avaya Internal Use Licenses – worth

25   millions of dollars – all without Avaya's authorization, knowledge, or consent." *Id*. ¶ 2.

26           Defendant Raymond Pearce, an Oklahoma citizen, was an Avaya employee from 2000-2018.

27   *Id*. ¶ 7. Pearce worked in an Oklahoma-based Avaya call center and he generated Internal Use

28   Licenses to help resolve customer support issues. *Id*. ¶ 34. "From a functionality perspective,

3

1    Internal Use Licenses are no different from the software licenses delivered to Avaya's paying

2    customers; however, Internal Use licenses are billed to Avaya at no cost, rather than the sale price

3    to Avaya's distributor or end-customer, as would otherwise occur." *Id*. Pearce used his employee

4    account and the "hijacked" accounts of other employees to generate the unauthorized software

5    licenses and to avoid Avaya's internal controls. *Id*. ¶¶ 35, 37.

6         Avaya alleges that Pearce provided the unauthorized software licenses to Hines, and that

7    "Defendant Hines would then access, beyond his authorization, the [Avaya Direct International

8    "ADI"] system[4] in order to download the Internal Use Licenses generated by Pearce and distribute

9    them, or facilitate their distribution, to end customers or other third party resellers, including at least

10   Defendants DBSI, Tri-State, Atlas, Telephone Man, and Telecom Spot." *Id*. ¶ 37. Avaya

11   discovered defendants' unauthorized license sales by purchasing sample software licenses resold by

12   defendants and then tracking their source, which Avaya discovered to be Pearce. *Id*. ¶ 35.

13        The FAC alleges that Avaya terminated DBSI's reseller agreement in 2013. *Id.* ¶ 38. "This

14   termination placed DBSI and Hines on a 'removed reseller' list and de-authorized partner access to

15   Avaya's license key systems, including ADI. However, even though Defendants DBSI and Hines

16   knew they no longer had partner authorization from Avaya for Avaya's license key systems, they

17   continued to access Avaya's software license portals, including ADI, beyond their authorization in

18   order to distribute the stolen Internal Use Licenses." *Id.* Avaya alleges that "[i]n addition to this

19   access beyond authorization, DBSI and Hines falsely claimed on their website, DBSI.net, to be an

20   'Authorized Dealer,' and specifically use Avaya's Marks to further the false claim of endorsement

21   and authorization by Avaya." *Id*. Avaya alleges that Hines, through his companies DBSI and US

22   Voice, as well as through numerous other online resellers, distributed and/or facilitated the

23   distribution of pirated Internal Use Licenses to thousands of end user customers, in exchange for

24   millions of dollars. *Id*. ¶ 39.

25        Avaya alleges that Mr. Hines "took further steps to circumvent Avaya's access controls by

26   creating one or more fake identities, including 'Chad Johnson,' and a separate company, Defendant

27

28        ⁴ The ADI system is a software license portal. *Id*. ¶ 18.

                                                      4

1    Tri-State, in order to further facilitate the scheme to access and distribute the pirated Internal Use

2    Licenses." *Id.* ¶ 43.  Tri-State became an authorized Avaya partner on May 13, 2014.  *Id.* ¶ 44.

3    Avaya alleges that Hines created Tri-State "for the primary purpose of allowing Hines additional

4    access to Avaya's ADI system and Product Licensing and Delivery System ('PLDS') in order to

5    distribute the stolen Internal Use Licenses." *Id.*  PLDS is a system that allows users to upgrade older

6    Avaya licenses that have already been downloaded from Avaya's ADI system.  *Id.*  "While Hines,

7    through DBSI, had retained some access to Avaya's PLDS system, DBSI/Hines could not order

8    upgrades for the stolen Internal Use Licenses after Avaya had terminated DBSI as an Avaya

9    partner." *Id.*  "[B]y leveraging Tri-State's partner access to PLDS, Defendants Hines/DBSI were

10   able to, for example, download an older 'R9' license from ADI (a pirated Internal Use License that

11   had been stolen and created by Pearce) and upgrade it to a newer ('R10' or 'R11') version of the

12   software through PLDS in order to meet an end customer's needs." *Id.*  "This allowed Defendants

13   Hines, DBSI, and Tri-State to obtain 'R10' and 'R11' licenses at little or no cost as a result of

14   abusing the PLDS upgrade process with stolen Internal Use Licenses." *Id.*  Avaya terminated Tri-

15   State's reseller agreement for cause on February 14, 2019.  *Id.* ¶ 47.

16

17   **III.    Evidence[5]**

18       **A.    Avaya's Declarations and Evidence**

19       Avaya submitted declarations and exhibits in the initial and supplemental rounds of briefing

20   on defendants' motions to dismiss for lack of personal jurisdiction.  To show that Hines, DBSI, and

21   US Voice & Data improperly accessed Avaya's ADI and PLDS systems, Avaya has submitted

22   declarations from its Senior Director, Cary Gumbert, and its Senior Manager, Lisa McCann.  Dkt.

23

24   ───────────────
         [5]  Defendants have objected to certain portions of the McCann and Alinder declarations.
25   Defendants contend that statements by Ms. McCann and Mr. Alinder regarding various business
     records constitute hearsay.  The Court OVERRULES these objections.  In some instances, the
26   objections have been mooted because Avaya provided the underlying business records in connection
     with the supplemental McCann and Alinder declarations.  For any testimony where Avaya did not
27   submit the underlying business records, defendants are entitled to those records in discovery.  If,
     after review of the records, defendants contend that Ms. McCann and/or Mr. Alinder have
28   mischaracterized those records, defendants may raise that issue with the Court.

1    No. 78-2 (Decl. Cary Gumbert); Dkt. No. 94-1 (Decl. Lisa McCann).  Mr. Gumbert states that

2    Avaya's business records show that "the account associated with Mr. Hines'[s] DBSI email and

3    ADI username login, jason@DBSI.net, alone had over 13,000 ADI logins between March 18, 2016

4    to November 15, 2018."  Gumbert Decl. ¶ 2.  Ms. McCann states that "the account associated with

5    [US Voice & Data], info@tristatecom.com, had over 300 ADI logins between January 1, 2015 and

6    November 15, 2018."  McCann Decl. ¶ 2.  Ms. McCann also states,

7          Indeed, between November 19-21, 2018, an individual named "Chad Johnson,"
           claiming to be Tri-State's Sales Manager contacted Avaya indicating "we can no
8          longer access the ADI site ourselves" and requesting assistance with getting the "ADI
           license files" associated with certain Avaya software license keys.  One of these
9          software licenses requested by Tri-State ended up being the last one created by
           Defendant Raymond Bradley "Brad" Pearce on November 14, 2018, using one of his
10         hijacked employee accounts.

11   *Id*. ¶ 3.

12         Avaya asserts that every time defendants accessed Avaya's corporate website, the ADI

13   system, and the PLDS website, defendants agreed to Avaya's Terms of Use.[6]  Avaya has submitted

14   a copy of the Terms of Use, along with several screenshots.  Suppl. McCann Decl., Ex. A & B;

15   Suppl. Alinder Decl., Ex. I.  Ms. McCann states that the version attached to her declaration, which

16   is quoted below, "was in force on the ADI and PLDS sites starting from at least March 2018."  *Id*.

17   The Terms of Use state in relevant part:

18         10.3.  Choice of Forum for Disputes.  If a Dispute by one party against the other
           cannot be settled under the procedures and within the timeframe set forth in Section
19         10.2, then either party may bring an action or proceeding solely in either the federal
           court in the Northern District of California or in state court in Santa Clara County
20         California.  Each party to the TOU consents to the exclusive jurisdiction of these
           courts, including their appellate courts, for the purpose of all actions and proceedings
21         arising out of or relating to the TOU.

22   *Id*. at Ex. A.  The end of the Terms of Use states:

23   ///

24

25        [6]  The FAC alleges that "in accessing Avaya's [ADI] software license portal, numerous
     Defendants, including specifically Hines, and DBSI and Tri-State through Hines, agreed to terms of
26   use, which required a click to accept and explicitly set forth exclusive jurisdiction in the Northern
     District of California and further made clear that Avaya is headquartered in Santa Clara, California."
27   FAC ¶ 18.  At the November 8, 2019 hearing, Avaya's counsel clarified that although the websites
     state that "Use of this site indicates you accept the Terms of Use," an individual could use the site
28   without affirmatively "clicking to accept" the Terms of Use.

HEADQUARTERS AVAYA INC

4655 Great America Parkway

Santa Clara, California

95054-1233, USA

*Id*. ¶ 2. The screenshots attached as Exhibit I to Mr. Alinder's supplemental declaration show that the Terms of Use were accessible from the ADI and PLDS websites via a link that Avaya included at the bottom of the systems' respective login pages, and that the websites state "Use of this site indicates you accept the Terms of Use [which are hyperlinked] and the Privacy Statement." Suppl. Alinder Decl., Ex. I.

Avaya also asserts that the evidence shows that defendants sold stolen Avaya software licenses to end customers in California, including within the Northern District. Regarding Tri-State, Ms. McCann states that "on or about June 2, 2018, Tri-State sold two Avaya software licenses to an end customer in Oakland, California, and the activation record reflects that both licenses were activated by Jason Hines. In addition, on or about November 13, 2018, Tri-State sold one Avaya software license to an end customer in Santa Maria, California, and the activation record reflects that the license was activated by Jason Hines." McCann Decl. ¶ 4; Suppl. McCann Decl., Ex. C, D (copies of screenshots of Avaya's business records showing license upgrade sales by Tri-State to Oakland customer, along with activation records reflecting Hines' activation of one license and activation by "Chad Johnson" of another license). Ms. McCann states that Avaya's business records show that from August 2017 to February 2019,

> the 'Chad Johnson' account associated with Tri-State (infotristatecom.com) was found to be activating an entitlement related to an Avaya software license purchase for more than 50 Avaya customer accounts where the customer record had a California address. These included customers with addresses of record in San Jose, Martinez, Oakland, Berkeley, and Salinas. In addition, at least ten of these California customer accounts linked to Tri-State are also linked to one or more stolen Avaya software licenses from defendant Pearce. For some of these customers, including those in Northern California, the Avaya software license activation related to an upgrade of the Avaya software on the customer's system.

McCann Decl. ¶ 5; Suppl. McCann Decl. ¶ 6 & Ex. D-E (providing additional information about the upgrading of licenses by Tri-State to end users in California, including in Oakland, including underlying business records); Suppl. Alinder Decl. ¶ 5 & Ex. C-D (discussing records showing

7

1  upgrade license sale by DBSI to third party reseller specifically for end user in California, which

2  was then activated by Tri-State, with underlying business records).

3  Avaya has submitted similar evidence with regard to DBSI. Avaya asserts that one set of

4  exhibits shows that on October 26, 2017, DBSI sold an Avaya ADI software license to a third-party

5  reseller located in Canada (Featurecom Inc.), and that the license was designated to be purchased

6  by a specific end customer in California. *See* Supp. Alinder Decl. ¶ 3 & Ex. A (October 26, 2017

7  email from Featurecom Inc. employee to Jason Hines showing "end user" in California; purchase

8  order and invoice dated October 26, 2017 showing purchase of software from DBSI to Featurecom

9  Inc. and listing same "end user" in California). Ms. McCann states in her supplemental declaration

10 that she "researched in Avaya's internal business records the license key provided in the DBSI

11 production, where on October 26, 2017, DBSI sold an Avaya software license to a third party reseller

12 for a specific end customer located in Fair Oaks, California. Avaya's internal business records show

13 that Defendant Pearce created this license as an internal use only license, using his internal admin

14 account on October 26, 2017 at 3:52 pm." Supp. McCann Decl. ¶ 7; *see also id*. at ¶¶ 10-12

15 (discussing other transactions involving DBSI with sales to California customers where licenses or

16 upgrades traced to Pearce); Supp. Alinder Decl. ¶ 4 & Ex. B (stating that from 2017 through 2019,

17 DBSI sold dozens more IPO licenses to a third-party reseller while the license was designated to go

18 to an end customer in California, with underlying business records as exhibit); *see also id.* at ¶¶ 5 &

19 Ex. C-D (discussing records showing DBSI sold upgrade license sales to third party resellers

20 specifically for end customers in California).

21 Avaya also submitted records that it asserts shows additional ADI license sales by DSBI into

22 California, the use of third party e-commerce sites in Northern California (PayPal and eBay) to

23 facilitate those sales, as well as DBSI's direct purchase of unauthorized Internal Use licenses from

24 Mr. Pearce. *Id*. ¶¶ 6-11 & Ex. E-H.

25

26 **B.    Defendants' Declarations and Evidence**

27 Mr. Hines has filed a declaration stating that he has never been a resident of California, never

28 owned property in California, never been to California for business matters, and he has never

1    assented to the jurisdiction of any California court. Hines DBSI Decl. ¶¶ 1, 3, 6, 7, 8, 11. Mr. Hines

2    also states that DBSI has never owned property in California, never advertised in or at California,

3    never earned more than 1% of its revenue from California, and never assented to California

4    jurisdiction. *Id*. ¶¶ 17, 18, 22, 23, 28, 30, 36. Mr. Hines has filed a similar declaration on behalf of

5    US Voice, but adds that US Voice & Data "has never derived any revenue from California

6    residents." Hines US Voice Decl. ¶¶ 1, 4, 6, 12, 13, 16, 17, 18, 27. Mr. Hines states that "[e]very

7    agreement I have signed, in which Avaya, Inc. was a party to the agreement, indicates the State of

8    New York shall be the venue for any dispute between the parties." Hines DBSI Decl. ¶ 14; *see also*

9    Hines US Voice Decl. ¶ 30 (same for US Voice). US Voice has also submitted a copy of US Voice's

10    Reseller Agreement, which states that any disputes arising out of the Reseller Agreement are

11    governed by New York law (and subject to binding arbitration). *Id*., Ex. A. Defendants have

12    submitted a supplemental declaration from Mr. Hines in which he states that he, DBSI, and US

13    Voice & Data never saw or clicked on the hyperlink to the Terms of Use for Avaya's ADI and PLDS

14    systems, were never aware of the existence of a forum selection clause in the Terms of Use, and

15    never affirmatively consented to the forum selection clause. Suppl. Hines Decl. ¶¶ 4, 6, 9, 11, 13,

16    14, 15 (Dkt. No. 133-1).

17

18                              **LEGAL STANDARD**

19        A defendant may move to dismiss the complaint for lack of personal jurisdiction. Fed. R.

20    Civ. P. 12(b)(2). Upon defendant's motion to dismiss for lack of personal jurisdiction, "the plaintiff

21    bears the burden of demonstrating that the court has jurisdiction over the defendant*." Pebble Beach*

22    *Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). In determining whether the plaintiff has met

23    this burden, a district court may consider evidence contained in affidavits and discovery materials.

24    *Data Disc, Inc. v. Sys. Tech. Assoc*., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977). However, when a

25    district court rules on a motion to dismiss for lack of personal jurisdiction without holding an

26    evidentiary hearing, the plaintiff need only make "a *prima facie* showing of jurisdictional facts to

27    withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Where

28    undisputed, a district court must take as true the plaintiff's version of the facts. *Am. Tel. & Tel. Co.*

*v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (citations omitted). Conversely, "conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a *prima facie* case for personal jurisdiction exists." *Id.*

Where there is no applicable federal statute that governs personal jurisdiction, a district court "may exercise personal jurisdiction over a defendant 'if it is permitted by [the state's] long-arm statute and if the exercise of jurisdiction does not violate federal due process.'" *Autodesk, Inc. v. Kobayashi + Zedda Architects, Ltd.*, 191 F. Supp. 3d 1007, 1013 (N.D. Cal. 2016) (quoting *Pebble Beach Co.*, 453 F.3d at 1154). Since "California's long-arm statute allows the exercise of personal jurisdiction to the fullest extent permissible under the U.S. Constitution," a district court need only determine whether the exercise of jurisdiction comports with federal due process requirements. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). A district court's exercise of personal jurisdiction comports with due process when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"The minimum contacts requirement can be satisfied by establishing . . . specific jurisdiction." *Adobe Sys. Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 958 (N.D. Cal. 2015) (citing *Helicopteros Internacionales de Colombia*, S.A. v. Hall, 466 U.S. 408, 414 (1984)). A district court has specific jurisdiction over the defendant when the following three-prong test is satisfied:

> (1) The non-resident defendant must direct [one's] activities or consummate some transaction with the forum or a resident thereof; or perform some act by which [one] purposefully avails [oneself] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one that arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

The plaintiff bears the burden of satisfying the first two prongs of the test, and if the plaintiff fails to satisfy either prong, then the district court does not have personal jurisdiction over the

1    defendant. *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004).

2    Alternatively, if the plaintiff satisfies both prongs, then the burden shifts to the defendant to present

3    a "compelling case" that the exercise of jurisdiction would not be reasonable under the third prong.

4    *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985). All three prongs of the test must

5    be met for the district court to exercise personal jurisdiction over the defendant. However, between

6    the first two prongs, "[a] strong showing on one axis will permit a lesser showing on the other."

7    *Autodesk*, 191 F. Supp. 3d at 1014 (citing *Yahoo! Inc. v. La Ligue Contre La Racisme El*

8    *L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (en banc)).

9

10    **DISCUSSION**

11    Plaintiff contends that this Court has specific jurisdiction over defendants because they

12    purposefully directed their activity at California by selling stolen software licenses to California

13    customers and because defendants knew that Avaya was a California company and thus would suffer

14    the copyright and trademark infringement in California. Plaintiff also argues that defendants agreed

15    to a forum selection clause specifying the Northern District of California every time they accessed

16    Avaya's ADI and PLDS systems, and that this fact shows that defendants knew Avaya was a

17    California company and provides a separate and independent basis for jurisdiction.[7]

18

19    **I.**     **Purposeful Direction**

20    The exercise of specific jurisdiction over a defendant is proper when the defendant has

21    purposefully directed activity at the forum state or has purposefully availed oneself of doing

22    business in the forum state. *Adobe Sys.*, 125 F. Supp. 3d at 960. "For . . . copyright infringement

23    actions, the Ninth Circuit requires a showing of purposeful direction." *Id*. (citing *Nissan Motor Co.*

24    *v. Nissan Computer Corp.*, 246 F.3d 675, 675 (9th Cir. 2000)). A defendant purposefully directs

25    activity at the forum state when the defendant "(1) [has] committed an intentional act, (2) expressly

26    aimed at the forum state, (3) causing harm the defendant knows is likely to be suffered in the forum

27

28    [7] Plaintiff also asserts that defendants waived their right to challenge jurisdiction by joining in a motion to lift the stay as to defendant Pearce. The Court disagrees and finds no waiver.

11

1  state." *Dole Foods Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Bancroft*, 223

2  F.3d at 1087).

3

4  ### A.     Intentional Act

5  An "intentional act" refers to "an intent to perform an actual, physical act in the real world,

6  rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d

7  at 806.  "In the Ninth Circuit, an 'intentional act' includes selling an allegedly infringing product,

8  even if such sales occur outside the forum." *Adobe Sys.*, 125 F. Supp. 3d at 960 (citing *Washington*

9  *Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012), *abrogation on other*

10  *grounds recognized by Axiom Foods, Inc. v. Acerchem Int'l Inc.*, 874 F.3d 1064, 1069 (9th Cir.

11  2017); *A-Z Sporting*, 704 F.3d at 674 (selling infringing footwear in Arkansas constituted intentional

12  act in analysis of whether Washington courts had jurisdiction).

13  The Court concludes that defendants performed an intentional act by allegedly accessing,

14  distributing, and selling stolen Avaya software licenses. *See id*.  To the extent defendants assert that

15  they did not commit an intentional act because "electronic activities do not meet the standard of an

16  'intentional act,'" US Voice's Mtn. at 8 (Dkt. No. 86), defendants are incorrect.  *See, e.g.*, *Mavrix*

17  *Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011) (reposting infringing photos

18  on website was intentional act); *Chanel Inc. v. Yang*, C No. 12-4428 PJH, 2013 WL 5755217, at *7

19  (N.D. Cal. Oct. 21, 2013) (advertising and offering for sale counterfeit and infringing products on

20  website satisfies intentional act requirement).

21

22  ### B.     Express Aiming

23  The second prong of the purposeful direction analysis is whether defendants expressly aimed

24  acts at the forum state.  "[T]he express aiming requirement . . . is satisfied when 'the defendant is

25  alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to

26  be a resident of the forum state.'"  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1077

27  (9th Cir. 2011).  In addition, the Ninth Circuit has held that this prong is met based on a non-resident

28  defendant's "exploitation of the California market for its own commercial gain."  *Mavrix Photo*,

1    647 F.3d at 1229-30 (holding defendant expressly aimed conduct at California where "a substantial

2    number of hits to [defendant's] website came from California residents," and website displayed

3    advertisements that were specifically targeted to California residents, which "indicates that

4    [defendant] knows—either actually or constructively—about its California user base, and that it

5    exploits that base for commercial gain by selling space on its website for advertisements.")

6          Defendants argue that Avaya has failed to show that the defendants expressly aimed conduct

7    at California. Defendants argue that Avaya has improperly lumped together the "DBSI defendants,"

8    and that most of the evidence relates specifically to DBSI, not Hines or US Voice. Hines argues

9    that there is no evidence that he personally directed conduct at California, and US Voice asserts,

10   without explanation, that the evidence submitted by Avaya shows that US Voice made purchases,

11   not sales. DBSI argues that the vast majority of the sales identified by Avaya are ones that DBSI

12   made to non-California resellers, and that the resellers' "fortuitous" sales to end-customers in

13   California does not show that DBSI targeted California customers. DBSI also emphasizes the fact

14   that only a small percentage of its direct sales were to California customers. Defendants also assert

15   that there is no evidence showing that they knew Avaya was a California resident.

16         The Court concludes that Avaya has met its burden to show that defendants expressly aimed

17   their activity at California, and to the extent there are factual disputes, the Court resolves them in

18   Avaya's favor. *See Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Accepting Avaya's

19   characterization of the evidence, the evidence submitted by Avaya shows that DBSI and US Voice

20   sold numerous stolen licenses to end customers in California, and that Mr. Hines was involved in

21   those transactions. To the extent that those sales were made to non-California resellers who then

22   sold the licenses to California customers, the documents submitted by Avaya indicate that

23   defendants were on notice that the end customers were in California. Further, the documents

24   submitted by Avaya show that DBSI and US Voice activated licenses for the California end

25   customers. By selling and activating licenses for numerous California customers, defendants

26   expressly aimed their activity at the forum state. *See Mavrix Photo*, 647 F.3d at 1229-30; *Adobe*

27   *Sys.*, 125 F. Supp. 3d at 961.

28         In addition, although defendants have stated "to the best of their recollection" that they did

13

1    not affirmatively click on the Terms of Use located on Avaya's ADI website, Hines, DBSI and Tri-

2    State do not deny knowledge that Avaya is headquartered in Santa Clara, California. Avaya alleges

3    that by virtue of being former Avaya partners, defendants knew that Avaya's principal place of

4    business is in Santa Clara, FAC ¶ 18. "[U]ncontroverted allegations must be taken as true" when

5    analyzing whether a plaintiff has established a *prima facie* showing for personal jurisdiction. *Ranza*

6    *v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). Thus, while the Court cannot conclude on the

7    present record that defendants affirmatively agreed to the Terms of Use located on Avaya's

8    websites, the Court takes as true plaintiff's allegation that defendants knew Avaya's principal place

9    of business is in Santa Clara.

10   Accordingly, Avaya has made a *prima facie* showing that defendants intentionally infringed

11   Avaya's copyrights by selling stolen licenses to California customers while knowing that Avaya

12   was a resident of this District. This is sufficient to satisfy the "express aiming" requirement. *See*

13   *Adobe Sys.*, 125 F. Supp. 3d at 961; *Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d

14   1093, 1105-06 (C.D. Cal. 2007).

15

16   **C.    Foreseeable Harm**

17   The third prong of the purposeful direction analysis is whether defendants are alleged to

18   have caused harm that they knew is likely to be suffered in the forum state. *See Mavrix Photo*, 647

19   F.3d at 1231. "In determining the situs of a corporate injury, '[o]ur precedents recognize that in

20   appropriate circumstances a corporation can suffer economic harm both where the bad acts occurred

21   and whether the corporation has its principal place of business.'" *Id.* (quoting *Dole Food Co., Inc.*

22   *v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002)). "The economic loss caused by the intentional

23   infringement of a plaintiff's copyright is foreseeable." *Id*.

24   The Court concludes that it was foreseeable that Avaya's economic loss would be suffered

25   in California based on the sales to California customers and because Avaya is headquartered in

26   California. *See id*. (finding foreseeable harm in California where plaintiff was headquartered in

27   California and where defendant targeted California consumers).

28

14

**II.      Claim Arising Out of Forum-Related Activity**

The second part of the specific jurisdiction test examines whether the plaintiff's claim arises out of the defendant's forum-related activities. *See Schwarzenegger*, 374 F.3d at 802. A plaintiff's claim arises out of or relates to the defendant's forum-related activity when the plaintiff would not have been injured "but for" the conduct that the defendant directed at the forum state. *Panavision Intern., L.P. v. Toepenn*, 141 F.3d 1316, 1322 (9th Cir. 1998). "In . . . copyright infringement actions, if the defendant's infringing conduct harms the plaintiff in the forum, this element is satisfied." *Id.*

For the reasons earlier discussed, the Court finds that defendants purposefully directed activity at California and that Avaya has properly alleged having suffered injury in California. Thus, the Court concludes that Avaya's claims arise out of the defendants' forum-related conduct.

**III.     Reasonableness**

Because Avaya has made out a *prima facie* case that the assertion of specific jurisdiction over defendants is constitutional, the burden shifts to defendants to "present a compelling case" that the exercise of jurisdiction would be unreasonable and therefore violate due process. *CollegeSource, Inc.*, 653 F.3d at1079 (citing *Burger* King, 471 U.S. at 477-48). To determine whether the exercise of jurisdiction over a defendant is reasonable, a district court must consider:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs[,] (2) the burden on the defendant of defending in the forum[,] (3) the extent of conflict with the sovereignty of the defendant's home state[,] (4) the forum state's interest in adjudicating the dispute[,] (5) the most efficient judicial resolution of the controversy[,] (6) the importance of the forum to the plaintiff's interests in convenient and effective relief[,] and (7) the existence of an alternative forum.

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir. 2002).

The Court finds that these factors generally weigh in favor of plaintiff and that defendants have not met their burden to show unreasonableness.

**A.      Purposeful Interjection**

A defendant purposefully interjects oneself into a forum state's affairs when the defendant

15

1    purposefully directs one's conduct at the forum state.  *See Haisen v. Grass Valley Medical*

2    *Reimbursement Fund, Ltd*., 784 F.2d 1392, 1401 (9th Cir. 1986) (finding that a defendant had

3    purposefully interjected oneself into California's affairs because the defendant purposefully directed

4    activity at California residents).  Here, for the reasons stated *supra*, the Court finds that the three

5    defendants purposefully interjected themselves into California's commercial affairs.

6

7    **B.    Burden on the Defendants**

8    Defendants argue that they would incur a substantial burden by having to defend in

9    California because they are New Jersey residents with no contacts in California, and the evidence

10   that they will use is located in New Jersey.

11   "A defendant's burden in litigating in the forum is a factor in the assessment of

12   reasonableness, but unless the inconvenience is so great as to constitute a deprivation of due process,

13   it will not overcome clear justifications for the exercise of jurisdiction."  *Panavision Int'l, L.P. v.*

14   *Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).  While the facts cited by defendants weigh against

15   jurisdiction, it is also true that "'modern advances in communications and transportation'" have

16   significantly reduced the burden of litigating outside one's home state.  *Metro-Goldwyn-Mayer*

17   *Studios, Inc. v. Grokster*, 243 F. Supp. 2d 1073, 1093 (C.D. Cal. 2003), *quoting Sinatra v. Nat'l*

18   *Enquirer, Inc*., 854 F.2d 1191, 1198-99 (9th Cir. 1991).  The Court concludes that while there is

19   some burden associated with litigating in California, this burden is not significant.

20

21   **C.    Conflict with a Foreign State's Sovereignty**

22   Defendants argue that there is a risk of conflict between California and New Jersey

23   sovereignty because the three defendants are headquartered in New Jersey, generate revenue and

24   pay taxes in New Jersey, and employ New Jersey citizens.  The three defendants argue that this

25   results in New Jersey having a greater interest than California in resolving the matter.  *Id*.

26   "Unlike a situation in which the defendant is from a foreign nation, the sovereignty barrier

27   is not particularly high when the defendant is merely from another state."  *Autodesk, Inc. v. RK*

28   *Mace Eng'g, Inc*., No. C-03-5128 VRW, 2004 WL 603382, at *8 (N.D. Cal. Mar. 11, 2004)

1   Furthermore, "this factor is not controlling." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements*

2   *Ltd.*, 328 F.3d 1122, 1133 (9th Cir. 2003), because it would otherwise always preclude suit against

3   a foreign defendant. *Gates Learjet Corp. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984). Here, the

4   Court finds that this factor is neutral because there is little risk of conflict with New Jersey

5   sovereignty by requiring New Jersey defendants to litigate in California on largely federal claims.

6   *See Panavision*, 141 F.3d at 1323 (noting that "the federal analysis would be the same in either

7   Illinois or California").

8

9   ### D.    Forum State Interest

10   "California has a strong interest in providing redress for the injuries [a] plaintiff has suffered

11   as a result of [a] defendant's alleged willful copyright infringement." *Autodesk*, 2004 WL 603382,

12   at *8 (finding that California had a substantial interest in remedying a tortuously injured plaintiff

13   whose primary place of business was California). Here, Avaya has a principal place of business in

14   California and alleges that the business suffered injury from Mr. Hines's, DBSI's, and US Voice &

15   Data's willful infringement, including infringing sales to California customers.    FAC ¶¶ 6, 71.

16   Thus, the Court finds that this factor weighs in favor of the exercise of personal jurisdiction.

17

18   ### E.    Efficient Resolution of the Controversy

19   Defendants argue that New Jersey is the most efficient forum because it is where the

20   evidence and witnesses are located and also where the alleged, unlawful conduct occurred. Avaya

21   argues that New Jersey is not the most efficient forum because witnesses will likely be located in

22   numerous states, Avaya is headquartered in California, the remaining defendants are located in

23   numerous states, and modern technological advances will ease the burden of Mr. Hines, DBSI, and

24   US Voice & Data needing to procure evidence and witnesses from New Jersey.

25   To determine whether a forum will provide the plaintiff efficient resolution of the

26   controversy, a district court "may . . . compare the relative efficiency of alternative forums."

27   *Autodesk*, 191 F. Supp. 3d at 1019. "[H]owever, . . . this factor is 'no longer weighed heavily given

28   the modern advances in communication and transportation." *Harris Rutsky*, 328 F.3d at 1133. Here,

17

United States District Court
Northern District of California

1    since the defendants are from various states, and the evidence and witnesses are likely located in

2    different states, the Court finds that this factor is neutral.

3

4        **F.    Importance of the Forum**

5        Defendants argue that the forum being California is of minimal importance to Avaya

6    obtaining adequate relief because, as the moving defendants are not California residents and do not

7    conduct business in California, it would be unfair to hold them liable under California law. Avaya

8    counters that a lawsuit in New Jersey would not offer Avaya adequate and efficient relief because

9    New Jersey does not have jurisdiction over the remaining defendants. Avaya argues that this would

10   cause the business to have to bring separate lawsuits in various states against the remaining

11   defendants. The Court agrees with Avaya and finds that this factor weighs in favor of the exercise

12   of jurisdiction.

13

14       **G.    Existence of an Alternative Forum**

15       Defendants argue that since they are subject to the personal jurisdiction of New Jersey courts,

16   New Jersey is an alternative forum in which Avaya may seek relief. Avaya contends that although

17   New Jersey has personal jurisdiction over the three moving defendants, New Jersey does not have

18   personal jurisdiction over the remaining defendants. Avaya argues that if New Jersey adjudicates

19   the matter, then Avaya would have to bring separate lawsuits against the separate, remaining

20   defendants, which is inefficient. *Id*.

21       "The plaintiff bears the burden of proving the unavailability of an alternative forum . . . ."

22   *Harris Rutsky*, 328 F.3d at 1134. Here, although Avaya argues that New Jersey would be an

23   inconvenient forum, the moving defendants have shown that New Jersey remains an alternative

24   forum because the moving defendants are subject to New Jersey courts' jurisdiction. Thus, the

25   Court finds that this factor is neutral.

26

27

28   ///

18

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motions to dismiss for lack of personal jurisdiction.

**IT IS SO ORDERED**.

Dated: November 25, 2019

_____

SUSAN ILLSTON
United States District Judge